**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| DARLENE GIBBS, *et al.*, *on behalf of themselves and all individuals similarly situated*, | : | |
| | : | Case No. 3:18-cv-00654-MHL |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MARK CURRY, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR CLASS CERTIFICATION OF CLAIMS**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and all other similarly situated individuals, submit this memorandum of law in support of their Motion for Class Certification.

**<u>INTRODUCTION</u>**

Defendant Mark Curry ("Curry") is one of the pioneers of the tribal lending model[1]—one of the few yet to be criminally convicted for his role in this type of lending scheme.[2] Although Curry has participated in the affairs of various tribal lending enterprises, this case concerns his

---

[1] In fact, Mr. Curry even founded the trade organizations that operate to lobby for and provide legal support of this model, the Online Lenders Alliance, http://onlinelendersalliance.org/, and the Native American Financial Services Association, https://nativefinance.org/.

[2] *See* Press Release, The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; Press Release, *The United States Attorney's Office, Eastern District of Pennsylvania, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

participation in the rent-a-tribe enterprise involving Think Finance and the Otoe-Missouria Tribe. After federal regulators shut down Think Finance's rent-a-bank arrangement in December 2010, Curry helped Think Finance establish and operate a rent-a-tribe arrangement with the Otoe-Missouria Tribe. The scheme was designed to evade the usury laws of certain states by using the tribal entity, Great Plains Lending, LLC, as the conduit for their loans.

Although Great Plains was held out as the "lender" of the internet loans, Think Finance was contractually entitled to handle its day-to-day operations and the material aspects of the loan process, including origination, servicing, marketing, and collection of the loans. Curry, who had a long history of business dealings with the Otoe-Missouria Tribe, oversaw the lending enterprise and acted as a liaison between Think Finance and the Otoe-Missouria Tribe. In exchange, Curry received 4% of the net revenue generated on the illegal loans—almost the same amount received by the Tribe for the use of its name on the loans. Even though regulatory enforcement efforts uncovered their scheme as early as August 2013, Curry and Think Finance continued to engage in the enterprise, including after the Second Circuit found that Great Plains and the Otoe-Missouria Tribe did not have a "legitimate interest in selling an opportunity to evade state law." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin*. Servs., 769 F.3d 105, 114 (2nd Cir. 2014).

Under the guise of their dubious claim that the loans were protected by tribal sovereign immunity, the enterprise made loans in Virginia with annual percentage rates in excess of 440%— more than 35 times the 12% interest rate cap in Virginia's Consumer Finance Act. *See* Va. Code § 6.2-1541 (A); Va. Code § 6.2-303. If a lender makes a loan exceeding 12% APR without a license in Virginia, Virginia law mandates that the "loan contract shall be void," and it prohibits the collection of "any principal, interest, or charges whatsoever with respect to the loan." Va. Code 6.2-1541(A)-(B).

In addition to the usury claims, Plaintiffs further allege that Curry violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), a statute enacted with the "principal aim" of eliminating "loansharking." *United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986) (citing S.Rep. No. 617, 90th Cong., 2d Sess. 78–80; H.R.Rep. No. 1574, 90th Cong., 2d Sess. 5). To achieve this goal, RICO prohibits both the collection of and the conspiracy to collect "unlawful debt," 18 U.S.C. § 1962(c)-(d), which RICO defines as a debt incurred where the usurious rate "is at least twice the enforceable rate" under state or federal law. 18 U.S.C. § 1961(6). As a participant and co-conspirator in this contemporary loansharking enterprise, Curry is jointly and severally liable to Plaintiffs and the class members for the collection of the unlawful debt.[3]

The rent-a-tribe enterprise unlawfully collected more than $18.4 million dollars from Virginia consumers pursuant to these void loans.[4] Plaintiffs seek to recover all amounts paid on these illegal loans and ask the Court to certify this class pursuant to Fed. R. Civ. Proc. 23(b)(3). Similar cases have been certified by other courts, including this Court's approval of a class settlement providing more than $15 million dollars in relief to Virginia consumers who were victims of a rival rent-a-tribe scheme. *Hayes v. Delbert Servs. Corp.,* 3:14-cv-258 (JAG), Dkt. 193 (June 30, 2017); *see also Inetianbor v. CashCall, Inc.*, No. 13-cv-60066-JIC, Doc. 284 at 17–18 (S.D. Fla. Sept. 19, 2016).[5]

---

[3] *See, e.g., States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) ("Every circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations.").

[4] Ex. 1, Oct. 20, 2017 Interrogatory Responses from Think Finance.

[5] After the court granted the plaintiff's motion for class certification in *Inetianbor*, the case subsequently settled for $11 million dollars in cash compensation, as well as $15 million dollars in loan forgiveness. *See, e.g.*, Florida CashCall Settlement, available at https://secure.dahladmin.com/FLCALL/Index; *see also Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 568 (S.D. Tex. 2000) (granting a contested motion for class certification in a case alleging,

## BACKGROUND

**A.      Statutory and Regulatory Background.**

As long ago as 1730, Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds, *Virginia Law of Interest and Usury*, 10 U. Rich. L.R. 77 (1975) (citing 4 Hennings Stat. 194). Even in this modern era where "state-by-state lobbying campaigns" have persuaded state legislators to reverse "nearly three hundred years" of prohibitions against "double- or even single-digit interest rate caps," Virginia has remained committed to its *longstanding* view that its residents should be protected from high-interest loans. Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 (2012) (providing historical context on usury laws).[6]

In accordance with this longstanding policy, Virginia's Consumer Finance Act ("CFA") prohibits a person from charging an annual percentage rate exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A). If a person violates the interest rate cap, the CFA imposes severe consequences, including criminal liability and forfeiture of *all principal*, interest, and any charges related to the loan. Va. Code §

---

inter alia, the defendant's usurious loans violated RICO and Texas's usury laws); *Upshaw v. Georgia (GA) Catalog Sales, Inc*., 206 F.R.D. 694, 700–01 (M.D. Ga. 2002) (granting a contested motion for class certification in a case alleging a company and its principal violated RICO and Georgia's usury laws).

[6] Usury laws are not unique to Virginia or the United States of America. In fact, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." *Peterson*, *supra*, at 896, n.9. Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country. In fact, with so many poor people, many indebted families, so many victims of serious crimes and so many corrupt people, no country can plan a serious economic recovery or even feel safe." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

**B.    Think Finance attempts to avoid lending regulations by originating its loans through First Bank of Delaware.**

It is no secret that "internet payday lenders have a weak history of complying with state laws." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 764 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance"). Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws—a tactic known as "rent-a-bank."[7] Beginning in 2005, the FDIC began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n. 16 (2012). In response to the crackdown on rent-a-bank arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id.*; *see also* Martin & Schwartz, *supra* at 1.

Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model. *See* Ex. 2. Under this arrangement, loans were originated in the name of First Bank

---

[7] *See, e.g.*, Jean Ann Fox & Edmund Mierzwinksi, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

of Delaware, but it served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor. Ex. 2 at TF-PA-504641. In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans. Ex. 2 at TF-PA-504640. By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, *i.e.*, the third parties who invested money to allow Think Cash to grow the scheme. Ex. 2 at TF-PA-504640.

The Federal Deposit Insurance Corporation took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist ordering it to terminate its relationship with "all third-party lending programs."[8] In response to the crackdown on rent-a-bank arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes in an attempt to evade state laws. Johnson, *supra*, at 399 n.16; Martin & Schwartz, *supra*, at 785. Like the rent-a-bank format, the loans would be originated in the name of a tribe, but the tribe would serve as nothing more than a nominal lender.

## C.   Think Finance shifts its business model to tribal lending.

After receiving notice of intent to terminate the relationship, Think Finance "assembled the executive team together that weekend to look at a wide variety of things to do." Ex. 3 at 157:6-8. According to Kenneth Rees, the chief executive officer and chairman of the board of directors at the time, Think Finance evaluated "opportunities in the UK," as well as "tribal" lending, which was "something [Think Finance] hadn't really evaluated in the past." Ex. 3 at 157:10-14. As part of this evaluation, Think Finance researched "other tribal lending businesses," including "a couple

---

[8] *See, e.g.*, *In the Matter of First National Bank*, Case No. FDIC-07-256b, Order to Cease and Desist, Order for Restitution, and Order to Pay (Oct. 9, 2008), *available at* https://www.fdic.gov/bank/individual/enforcement/2008-10-03.pdf.

of court cases at the time that had just been decided in favor of the tribes," that "seemed to specify what it would take for a tribal lending entity to have sovereign immunity and not to be… subject to state law as per the tribal sovereignty would be." Ex. 3 at 158:2-10. According to Rees, Think Finance "had a business model" that "worked well" with First Bank of Delaware, and it wanted its tribal lending arrangement "to replicate that as much as possible." Ex. 3 at 183:17-22.

As early as January 2011, Think Finance began vetting potential tribal partners and identified the Otoe-Missouria Tribe as a potential candidate. *See generally* Ex. 4. Curry, who had a rent-a-tribe lending arrangement in place with the Otoe-Missouria Tribe, facilitated a meeting between Think Finance's executives and the Otoe-Missouria Tribe. Ex. 3 at 161:19-23. On or around January 12, 2011, representatives of Think Finance met with members of the Otoe-Missouria Tribe. *See generally* Ex. 4. Prior to this meeting, employees of Think Finance created a PowerPoint presentation entitled "Great Plains Lending Meeting," which contained an agenda of key points to present to the Otoe-Missouria Tribe. *See* Ex. 4 at TF-PA-1676. The agenda of key points included a company overview of Think Finance, an overview of the loan program, the structure of the arrangement, contractual arrangements, operational responsibilities, and next steps. Ex. 4 at TF-PA-1676. Great Plains had not been formed as of this meeting, and the presentation identified one of the "next steps" as "[c]reate tribal entity—Great Plains Lending, LLC." Ex. 4 at TF-PA-1686. The other steps included setting up a "tribal bank account," "[r]eview/approve consumer legal documents," and "[r]eview/sign contractual agreements." Ex. 4 at TF-PA-1686.

After the initial meeting, Think Finance began negotiations with the Tribe and Curry to finalize the three-sided lending venture. As part of these negotiations, Curry wanted Think Finance to contract directly with his company rather than the tribal lender. *See* Ex. 3 at 182:11-183:13. Rees explained that Think Finance did not think this structure "was a smart way to do business,"

in part, because Think Finance "had a business model" that "worked well" with First Bank of Delaware, and it wanted its tribal lending arrangement "to replicate that as much as possible." Ex. 3 at 183:17-22. Put differently, working through "another entity" did not "feel like the right relation," as it did not appear that Curry's company had "any sovereign rights to lend at all." Ex. 3 at 183:22:184:4.

After being unable to strike a deal with Curry and the Otoe-Missouria Tribe, Think Finance began soliciting other tribes, including the Chippewa Cree Tribe, to participate in the venture. *See generally* Ex. 5. As part of this process, Think Finance created a PowerPoint entitled "Emergency Cash Lending—A New Source of Tribal Revenue." Ex. 5 at TF-VA0290544. The PowerPoint claimed that "[o]nline emergency cash lending" represented "a significant opportunity for increased tribal revenue" and that Think Finance had "a unique turnkey solution for helping tribes enter this lucrative market." Ex. 5 at TF-VA0290545. The "[t]urn-key solution include[d] technology, marketing, risk management, compliance support, and access to capital funding," which could be "[u]p and running 90 days from signed contracts." Ex. 5 at TF-VA0290546. Think Finance's presentation further explained that "[u]sing Think Finance technology and services," would allow tribes to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." Ex. 5 at TF-VA0290545. The primary sources of this revenue were "[e]mergency cash users—mainstream Americans," who were "65% female," with household income of "$25K-50K" who primarily needed the emergency loans for unexpected bills, medical costs, car repairs, or to avoid overdrafts. Ex. 5 at TF-VA0290547.

Although talks initially stalled with Curry and the Tribe, negotiations picked back up in February 2011, around the same time Think Finance was negotiating with the Chippewa Cree

Tribe. Ex. 3 at 184:12-18.[9] On February 24, 2011, Curry, Think Finance, and the Otoe-Missouria Tribe reached a compromise regarding the structure, which allowed Curry to be the primary point of contact for the Tribe, ensure his involvement in key decisions, but at the same time ensure a direct relationship between Think Finance and the tribal lender. This structure was embodied in the key contracts executed between Think Finance, Great Plains, and Curry.

**D.    The key contracts and structure of the rent-a-tribe scheme, including the Consulting Agreement with Sentinel Resources.**

After the parties agreed in principal regarding the structure, they entered into a series of agreements to finalize each party's role and responsibility in the enterprise, including: (1) a Participation Agreement between GPLS and Great Plains; (2) an Administrative Agency Agreement between GPLS and TC Administrative; and (3) a Consulting Agreement between Sentinel Resources, Great Plains, and Think Finance.

*Participation Agreement.* The Participation Agreement established GPL Servicing, Ltd.'s ("GPLS")[10] right to purchase the loans originated in the name of Great Plains. In particular, the

---

[9] Although she worked for one of Think Finance's other enterprises, it is important to note that the former chief executive officer of Plain Green (the tribal lender created by the Chippewa Cree Tribe) testified that: 1) she agreed with the plaintiffs' characterization that Plain Green was a "rent-a-tribe"; (2) Plain Green had no meaningful role in the lending program other than pro forma review of recommendations from Think Finance; (3) Think Finance handled every material aspect of the lending program, including marketing, underwriting, origination, servicing, funding, and collection of the loans; and (4) Think Finance intentionally tried to conceal information from Plain Green so that it was dependent on Think Finance, who could then continue to demand the vast majority of the profits from the lending business. Ex. 6, Raining Bird Depo., 52:13-55:13; 85:8-22; 102:3-18, 139:8-141:15.

[10] GPLS was an employee-less company created to raise and provide the capital to fund the hundreds of millions of dollars of illegal loans made to consumers. According to Think Finance itself, GPLS was created "to allow investors to purchase interests in the consumer loans originated by Native American Tribal lending businesses." *See* Complaint at ¶ 24, *Think Finance, LLC, v. Victory Park Capital Advisors, LLC*, Case No. 17-03106 (Banc. Tex.) (explaining the creation of GPLS). A private equity firm, Victory Park Capital Advisors, LLC owned most of the shares of GPLS, but "Victory Park required that Think Finance purchase a portion of the equity in GPLS, which it did through Think SPV." Id. at ¶ 26. The enterprise also raised money from third party

Participation Agreement entitled GPLS to purchase an "undivided ninety-nine percent (99%) participation interests" in the Great Plains loans, "including any income or profits therefrom and the applicable Loan Documents." Ex. 7 at § 2(a). As a result of the purchase, GPLS was "considered for all purposes as, the legal and equitable owner" of the interest in each loan "and the associated Loan Documents… together with all of the rights, privileges and remedies applicable thereto." Ex. 7 at § 2(c). In return for the use of its name on the loans, the Participation Agreement entitled Great Plains to receive a "Service Fee" of 6% to 10% depending on the outstanding balance of the portfolio. Ex. 7 at §§ 1(fff), 2(a).[11]

*Administrative Agency Agreement*. Through a separate agreement entitled "Administrative Agency Agreement," GPLS then assigned its rights to the income and profits to TC Administrative Services, an employee-less company wholly owned and operated by Think Finance. The Administrative Agency Agreement designated TC Administrative with certain responsibilities and, in return, TC Administrative received an "Agent Fee," which was defined as "the interest and fees received on the Purchased Loans during such months," as well as the "principal collected in such month on Purchased Loans that were Non-Current Purchased Loans in the prior month." Ex. 8 at 2. TC Administrative's fee was reduced by: (1) the 20% "Fixed Return" of the outstanding principal amount loaned by GPLS, and (2) any and all expensed incurred by GPLS, "including, but not limited to, the Revenue Share paid to [Great Plains] for such months" pursuant to the Participation Agreement. Ex. 8 at 2.

---

investors. *Id*. at ¶ 27. The enterprise used the money invested in GPLS to make the illegal loans to consumers.

[11] As explained below, Curry received 4% of Great Plains' service fee.

*Consulting Agreement*. The Consulting Agreement between Curry's company, Sentinel Resources, Think Finance, and Great Plains served primarily two purposes: (1) it designated Sentinel Resources, and thus Curry, with control over Great Plains' operations that were not handled by Think Finance and (2) it required communications from Think Finance to the Tribe to go through Curry—ensuring that Think Finance could not infringe on Curry's other lending business with the Tribe. *See generally* Ex. 9. To accomplish these goals, the Consulting Agreement provides that Sentinel Resources shall be the "exclusive provider of guidance and authority in business dealings" between Think Finance and Great Plains. Ex. 9 at § 1.3(a). To that end, if Think Finance "desire[d] to change or modify the structure or operating policies" of Great Plains, the Consulting Agreement required Think Finance to "review any changes with" Sentinel Resources and to "receive specific written permission" to "make such alterations or modifications." Ex. 9 at 12. In turn, Sentinel Resources would "review and provide guidance" to Great Plains "for any proposal" from Think Finance concerning any "new and/or modified loan product or program." Ex. 9 at 12. To ensure efficient coordination between the co-conspirators, the agreement further required Sentinel to "schedule a program review" with Great Plains and Think Finance "at least once each quarter to discuss performance and the regulatory environment." Ex. 9 at 12.

The Consulting Agreement further prohibited Think Finance from communicating directly with any "equity owners" of Great Plains. Ex. 9 at 12. Instead, Sentinel Resources was "responsible for communications" between Think Finance and Great Plains, including communications with the "Otoe-Missouria Chairman on all matters pertinent to the business relationship between" Think Finance and Great Plains. Ex. 9 at 12. The agreement also required any "legal contact" pertaining to Great Plains, as well as any "public communication" such as website information or press releases, to be reviewed by Sentinel Resources. Ex. 9 at 13.

The term of the agreement was for five years and it automatically renewed each year unless any party terminated it in writing—an event that appears to never have occurred. Ex. 9 at § 3.1. And critically, if Think Finance terminated the Consulting Agreement, the Participation Agreement automatically terminated. Ex. 7 at § 16(iii) ("This Agreement shall automatically terminate simultaneously with the termination of (A) Consulting Agreement…"). In other words, Think Finance and its co-conspirators' ability to purchase "any income or profits" from the loans was contingent on Curry's continued involvement in the scheme.

**F.     Curry received 4% of the net revenue on the loans.**

As explained above, Think Finance paid Great Plains a "service fee" of 6-10% of the net revenue collected on the loans depending on the amount collected each month. Ex. 7 at 31. When the amount was less than $10,000,000.00, the service fee was 10%. Ex. 7 at 31. Great Plains, however, did not receive the full 10% of the net revenue. Instead, 6% went to Great Plains; and the other 4% went to Curry, through Sentinel Resources. Ex. 10 at ¶ 5 (explaining that 6% of the revenue went to Great Plains; 4% of the revenue went to Sentinel).[12] Based on the figures provided by Think Finance, it appears that Curry received, *at a minimum*, $18,000,000.00 as a result of his participation in the enterprise.

## NATURE OF PLAINTIFFS' CLAIMS AND THE PROPOSED CLASSES

Plaintiffs obtained loans from Great Plains. Each of the loans imposed interest rates that violated Virginia's interest rate cap. For example, Inscho's loan had an APR of 448%; Gibbs's loan had an APR of 277.92%, Williams's loan had an APR of 247.88%; and Deleon's loan had an APR of 248.32%. *See, e.g.*, Ex. 11, Oct. 5, 2016 Loan Agreement. Thus, Plaintiffs' claims are

---

[12] Although the parties never terminated the Consulting Agreement, it appears that Curry received his portion of the service fee through another one of his companies, the MacFarlane Group. Regardless of the company by which the money was passed through, it ultimately went to Curry.

simple and straightforward—they accuse the enterprise of engaging in a scheme to lend money to Virginia consumers at interest rates far exceeding those permitted by Virginia law. These loans violate Virginia law on their face, and the enterprise was prohibited from collecting anything from Virginia consumers. Defendants' conduct also violated RICO. Plaintiffs, therefore, seek certification of the following classes of Virginia consumers, of which Plaintiffs are all members:

> **Virginia RICO Class:** All Virginia consumers who paid any amount on their loan with Great Plains.

> **Virginia Usury Class:**  All Virginia consumers who paid any amount on their loan with Great Plains.

> **Virginia Unjust Enrichment Class**: All Virginia consumers who paid any amount on their loan with Great Plains.

## LEGAL STANDARD

"To obtain class certification, a plaintiff must satisfy the four requirements" of Rule 23(a) of the Federal Rules of Civil Procedure, and the case "must also fall within at least one of the types of class actions defined in Rule 23(b)." *Branch v. Gov't Employees Ins. Co.*, 323 F.R.D. 539, 544, (E.D. Va. 2018). The Court must undertake a "rigorous analysis" as to each requirement. *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 351 (2011) (internal quotations omitted). Because of the rigorous analysis required by *Dukes*, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." *Branch*, 323 F.R.D. at 545 (quoting *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006)). Although this analysis may "overlap into the merits of the underlying case," the "likelihood of the plaintiff's success on the merits . . . is not relevant to the issue of whether certification is proper." *Id.* (quoting *Thorn*, 445 F.3d at 319). Stated differently, Rule 23 does not provide courts with a "license to engage in free-ranging merits inquiries at the certification stage," and merits questions should be considered "only to the extent" that "they are relevant to

determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

## ARGUMENT

Federal courts have long regarded "consumer claims" as "particularly appropriate for class resolution." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Mexican Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001); *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 395-96 (N.D. Ill. 2006) ("Consumer claims are among the most commonly certified for class treatment"). As explained below, this case is no different as Plaintiffs' claims satisfy the four prerequisites of Rule 23(a) and fall within two of the types of class actions allowed by Rule 23(b).

**A.     The Classes meet the requirements of Rule 23(a).**

**1.     Numerosity is satisfied.**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a). There is no set minimum number of potential class members that fulfills the numerosity requirement. *See Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) (citing *Kelley v. Norfolk & Western Ry. Co.*, 584 F.2d 34 (4th Cir. 1978)). Where the class numbers 25 or more, joinder is usually impracticable. *Cypress v. Newport News Gen'l & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (finding that 18 class members was sufficient to fulfill the numerosity requirement); *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 199 (E.D. Va. 2015) (granting class certification where class included roughly 1,000 persons).

Here, the numerosity requirement is easily met. At the pre-certification stage, it is "not required that the exact size of a class be established" so long as "general knowledge and common sense would indicate that it is large." *Harris v. Rainey*, 299 F.R.D. 486, 489 (W.D. Va. 2014). Think Finance admitted that the estimated number of borrowers who were victimized by their

unlawful conduct "will exceed one million." *Think Finance*, Case No. 17-03106, Dkt No. 69 at 14. Based on U.S. Census Bureau statistics, this figure translates to more than 20,000 affected Virginia consumers assuming the ratio of loans was consistent with the U.S. population as a whole.[13] Moreover, Virginia consumers paid more than $18.4 million dollars on these small-dollar loans within the past four years—a clear indication that the class includes thousands of consumers. (Ex. 1, at Int. No. 10). Accordingly, Rule 23(a)(1)'s numerosity prerequisite is easily satisfied.

### 2.    An ascertainable and identifiable class exists.

Although it is not required by the plain language of Rule 23(a)(1), the Fourth Circuit has implicitly required that a plaintiff "readily identify class members in reference to objective criteria." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *see also* 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760 (3d ed. 2005). This prerequisite—often referred to as an ascertainability requirement—does not require a plaintiff "to identify every class member at the time of certification." *Id*. Rather, the plaintiff must merely demonstrate that objective criteria to determine the class exists. In other words, "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id*.

Here, class membership is readily ascertainable as the definition is based entirely on objective criteria and class members are identifiable, mostly through electronic data analysis. Identification of the class members involves a handful of discrete steps: (1) determining whether a consumer had a loan originated by Great Plains, (2) for all such consumers, determining whether

---

[13]    *Compare*   U.S.   Census   Bureau   QuickFacts:   United   States,   available   at https://www.census.gov/quickfacts/fact/table/US/PST045216 (reported population estimate of 325,719,178 in United States as a whole) *with* U.S. Census Bureau QuickFacts: Virginia, available at https://www.census.gov/quickfacts/fact/table/FL/PST045216 (reported population estimate of 8,470,020 in Virginia).

they had a Virginia address when they executed the loan, and (3) identifying any payments made by those consumers. The answers to these questions are readily ascertainable through loan records obtainable from Think Finance and/or GPLS. *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 572 (S.D. Tex. 2000) ("[I]dentification of consumers who took the allegedly unlawful loans and the amount of their injuries would be easily ascertainable from Defendants' records and thus constitute no obstacle to class certification."). Accordingly, the class is ascertainable.

### 3. The Class Members share common questions of law and fact.

Rule 23(a)(2) requires the court to find that there are questions of law or fact common to the class, but complete congruence of those questions is not necessary. *Lienhart v. Dryvit Sys. Inc.,* 255 F.3d 138, 146 (4th Cir. 2001); *Centr. Wesleyan Coll. v. W.R. Grace & Co*., 143 F.R.D. 628, 636 (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993). "Commonality is satisfied where there is one question of law or fact common to the class, and a class action will not be defeated solely because of some factual variances in individual grievances." *Jeffreys v. Commc'ns Workers of Am.*, 212 F.R.D. 320, 322 (E.D. Va. 2003); *Manuel v. Wells Fargo Bank, Nat. Ass'n*, No. 3:14CV238, 2015 WL 4994549, at *9 (E.D. Va. Aug. 19, 2015) ("To satisfy [the commonality] requirement, there need be only a single issue common to the class.").

In this instance, the questions of fact and law are entirely common. From a factual standpoint, the claims asserted by Plaintiffs and the class members originate from the same conduct, practice, and procedure on the part of Curry, Sentinel Resources, and the other members of the enterprise, namely the use of a rent-a-tribe scheme in an attempt to evade interest rate laws in Virginia. Based on these facts, Plaintiffs and the class members share a number of common questions of law that can all be decided with common proof, including: (1) whether the interest rates used on loans violate Virginia's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the laws of the Otoe-Missouria are enforceable; (3) whether

the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants participated or operated in the management of the enterprise; (5) whether Defendants agreed that the enterprise would be used for the purpose of collection of unlawful debt; and (6) whether the amounts paid by each consumer are recoverable against Defendants.

Courts have found common questions in cases based on similar factual allegations and legal claims. This includes certification of classes in cases alleging that the defendants used a subterfuge, such as a purported tribal lender, to conceal the fact that they were making unlawful loans. For example, in *Inetianbor v. CashCall, Inc.*, a case involving a similar rent-a-tribe scheme, the court found that:

> The proposed class' claims share multiple questions of law and fact. For example, it is a common question of fact whether CashCall improperly used Western Sky as a "front" for its lending business, invoking Tribal law in an attempt to shield the enterprise from State regulation and consumer laws. Additionally, all class members entered into loan agreements with materially similar terms; therefore, whether the loan contracts are void for charging usurious interest rates is a legal question common to all or nearly all members of the class. Further, whether the loans violated Florida lending and consumer protection law and whether Reddam can be held personally liable are legal questions common to the class.

No. 13-cv-60066-JIC, Doc. 284 at 17–18 (S.D. Fla. Sept. 19, 2016). The facts in this case are comparable to those in *Inetianbor* and similarly warrant a finding of commonality.

Other decisions involving non-tribal usurious loans are in accord. *See, e.g.*, *Purdie v. Ace Cash Express*, No. Civ. A. 301CV1754L, 2003 WL 22976611, at *3 (N.D. Tex. Dec. 11, 2003) ("Here, the members of the putative class share a common factual circumstances of having obtained payday loans that were originated, serviced and collected in a uniform manner according to policies and procedures implemented by Defendants on a nationwide basis."); *Upshaw v. Georgia (GA) Catalog Sales, Inc.*, 206 F.R.D. 694, 699 (M.D. Ga. 2002). As to the commonality element, *Upshaw* identified "numerous common issues," including, among others, "[w]hether the interest charged on the loans violates the Georgia usury laws" and "[w]hether the loans and interest

17

are unlawful debts, the collection of which violates RICO." *Id.* at 699; *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 155 (S.D.N.Y. 2017) (finding commonality in a case alleging violations of New York's usury laws based on the "common injury" of "the attempted collection of interest at a usurious rate").

Similarly, RICO claims against illegal lenders are well suited to class certification because a RICO claim "has as its principal question whether Defendants conducted or participated in the conduct of the alleged enterprise(s) through patterns of racketeering" related to "collection of an unlawful debt in violation of 18 U.S.C. § 1964(c)." *Henry*, 199 F.R.D. at 571–72 ("Because such a claim requires Plaintiffs to show a 'pattern of activity,' the proof in a class action and in an individual action are the same."); *Heastie v. Community Bank of Peoria*, 125 F.R.D. 669 (N.D.Ill.1989). Accordingly, commonality is satisfied.

### 3.      Plaintiffs' claims are typical of the Classes' claims.

A class representative's claims or defenses must be "typical" of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). The Fourth Circuit has described the typicality requirement as "the heart of a representative [party's] ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). Typicality demands "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.*; *accord Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 264 (4th Cir. 2012); *Lienhart*, 255 F.3d at 146. A plaintiff's interest in prosecuting her case must advance the interests of the Class. *Soutter*, 498 F. App'x at 264.

Nonetheless, typicality does not require that a class representative's claims be perfectly identical to the class members' claims. *See, e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 337 (4th Cir. 1998); *Deiter*, 436 F.3d at 467; *Soutter*, 498 F. App'x at 265; *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 105 (E.D. Va. 2009). Rather, "the interests of the party

representing a class must be substantially similar to those of the unrepresented parties." *In re Mills*, 257 F.R.D. 101, 105 (E.D. Va. 2009); *see also In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006). However, "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification." *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. at 538 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 178 (2d Cir. 1990)). As the Fourth Circuit explained:

> To determine if [the plaintiff] has shown typicality, we compare her claims and [the opposing party's] defenses to her claims with those of purported class members by reviewing the elements of [the plaintiff's] prima facie case and the fact supporting those elements and examining "the extent" to which those facts "would also prove the claims of the absent class members."

*Soutter*, 498 F. App'x at 265.

Plaintiffs' claims satisfy the typicality requirement of Rule 23. Here, Plaintiffs assert a uniform practice of charging usurious loans to consumers, using the now-rejected rent-a-tribe model to do so. RICO defines "unlawful debt" as a debt incurred in connection where the usurious rate "is at least twice the enforceable rate" under state or federal law. 18 U.S.C. § 1961(6). In other words, § 1962(c) "encompasses efforts to collect on a usurious loan" such as the predatory loans made to Plaintiffs in this case. *See Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016). Plaintiffs and the class members are all in the same boat; they were all subject of the making and collection of the usurious loans, and the only genuine difference from one member to another is the level of financial harm incurred.

Again, *Inetianbor* is instructive. There, the court found that the plaintiffs' claims, based on usurious loans made pursuant to a rent-a-tribe scheme, were "typical of those of the proposed class" because the plaintiffs all "entered into Western Sky loan agreements with materially similar terms, including interest rates that allegedly exceeded the allowable rate under Florida law," and "all members of the proposed class may allege similar damages as a result of Defendants' actions."

*Inetianbor*, Ex. 22, at 19. Similarly, another court has explained "[t]ypicality is inherent in the class definition because each member entered into the same type of transaction, a payday loan, with Defendants and his/her claims arose from the same practices of Defendants." *Henry*, 199 F.R.D. at 571–72.

Like *Inetianbor*, Plaintiffs' claims for usury and violations of Virginia's usury laws are typical of those of the proposed classes. If Plaintiffs prove that Defendants violated RICO and Virginia's usury laws, they will advance the claims of all of the putative class members to the same degree. *Milbourne v. JRK Residential Am., LLC*, No. 3:12CV861, 2014 WL 5529731, at *7 (E.D. Va. Oct. 31, 2014) ("Because there are no factual differences between claims and the members all raise the same legal issue as [the Plaintiff], there are no factual or legal differences between the class members' claims and [Plaintiff's] claim. … For the foregoing reasons, the typicality factor is satisfied." (citations omitted)); *Dreher v. Experian Info. Sols., Inc.*, No. 3:11-CV-00624-JAG, 2014 WL 2800766, at *2 (E.D. Va. June 19, 2014) ("The evidence [Plaintiffs] will rely on to establish each element of the case will similarly establish the claims of each absent class member."). Accordingly, the typicality prerequisite is satisfied.

### 4. Plaintiffs and their Counsel will adequately represent the Classes.

Rule 23(a)'s final component requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This prerequisite is met if: "(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class' interests; and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the litigation." *In re Se. Hotel Props. Ltd. P'ship Investor Litig.*, 151 F.R.D. 597, 607 (W.D.N.C. 1993).

"The burden is on the defendant[] to demonstrate that the representation will be inadequate." *Johns v. Rozet*, 141 F.R.D. 211, 217 (D.D.C. 1992); *see also In re Se. Hotel Props.*,

151 F.R.D. at 607; *Lewis v. Curtis*, 671 F.2d 779, 788 (3rd Cir. 1982); *Trautz v. Weisman*, 846 F. Supp. 1160, 1167 (S.D.N.Y. 1994). Defendants cannot possibly satisfy their burden with respect to the fairness and adequacy of representation. Plaintiffs' counsel are experienced in class-action work as well as consumer protection issues and have been approved as class counsel in numerous cases before this Court. *Clark v. Trans Union, LLC*, 3:15-cv-391, 2017 WL 814252, at *13 (E.D. Va. Mar. 1, 2017) (collecting cases and stating "This Court has repeatedly found that [proposed Class Counsel] is qualified to conduct such litigation. This Court echoes the sentiments previously stated about [proposed Class Counsel] because they pertain here with equal vigor." (citations omitted)).[14]

Plaintiffs' interests and those of members of the proposed classes are fully aligned. The named Plaintiffs have no conflicts with the putative classes. All seek a determination that Defendants violated RICO through the "collection of unlawful debt," that Defendants received interest on the loans made to Virginia consumers in violation of Virginia's laws, and that Defendants were unjustly enriched by Plaintiffs' payments on the void loans. Further, Plaintiffs and the proposed class members share identical interests in establishing Defendants' liability for their roles in the scheme. Additionally, Plaintiffs have and will continue to vigorously prosecute their claims against those involved in this scheme. In the case involving Think Finance, three of the four plaintiffs answered discovery, sat for depositions, and continued to litigate the case even though Think Finance filed for bankruptcy in an attempt to avoid legal accountability to consumers. Ex. 12, Kelly Decl. ¶¶ 13. And all the named Plaintiffs have participated actively in this case by providing documentation, keeping updated on the case's status, and reviewing

---

[14] Declarations from each firm seeking to serve as class counsel setting forth their experience and ability to serve as Class Counsel are attached. Ex. 12, Kelly Declaration; Ex. 13, Bennett Declaration.

pleadings. *Id.* In short, they have assisted and cooperated from the beginning to benefit all Virginia consumers similarly situated.

**B.**     **The classes likewise meet the demands of Rule 23(b)(3).**

  **1.**     **Common questions predominate over individual ones.**

Under Rule 23(b)(3), the common questions found under Rule 23(a)(2) "must predominate over any questions affecting only individual members." *Amchem,* 521 U.S. at 615. Whether common questions predominate over individual questions "is a separate inquiry, distinct from the requirements found in Rule 23(a)." *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 304 (4th Cir. 2013) (citing *Wal–Mart,* 131 S. Ct. at 2556). This requirement is "even more demanding than Rule 23(a)," *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem,* 521 U.S. at 623. This analysis is not simply a matter of counting common versus noncommon questions and checking the final tally. *Soutter*, 307 F.R.D. at 214. Instead, "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *Stillmock v. Weis Markets, Inc.*, 385 Fed. App'x. 267, 272 (4th Cir. 2010) (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003)). In other words, Rule 23(b)(3) "compares the quality of the common questions to those of the noncommon questions." *Soutter*, 307 F.R.D. at 214 (quoting *Newberg* § 3:27).

If the "qualitatively overarching issue" in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues. *See Ealy*, 514 Fed. App'x. at 305 ("Indeed, common issues of liability may still predominate even when some individualized inquiry is required."). For example, if "common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Stillmock,* 385 Fed. App'x. at 273 (citing *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st Cir. 2003)). This is because class certification in those cases will still

"achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Gunnells*, 348 F.3d at 424 (citing *Amchem*, 521 U.S. at 615); *see also id.* at 426 ("Proving these issues in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues. Consolidation of these recurring common issues will also conserve important judicial resources.").

Here, common issues necessarily predominate because Plaintiffs' claims are all based on standardized conduct by Defendants toward them and fellow class members: namely, employing the rent-a-tribe scheme to issue and collect on usurious loans in Virginia. As the court found in *Intetianbor*, common issues predominate in rent-a-tribe schemes for usurious loans because of "the standardized nature of the loan transactions and the uniform manner in which defendants made, processed and collected on the loans," such that "few variations exist in the claims and the legal claims and theories asserted." *Inetianbor*, Ex. 20, at 21; *see also Purdie*, 2003 WL 22976611, at *4 (finding predominance in a payday lending case based on standardized loan transactions); *Upshaw*, 203 F.R.D. at 700–01 (finding predominance in a payday lending case because "Defendants' conduct was substantially the same with respect to all members of the class," and "[t]his conduct gives rise to Plaintiffs' class-wide liability claims for violation of the Georgia usury laws and RICO"). Defendants' conduct was not only substantially the same as to all members of the classes, but there are also no material individual defenses to Plaintiffs' usury and RICO claims. *Henry*, 199 F.R.D. at 572 ("[T]he common questions are whether Defendants were engaged in racketeering activity or collecting an unlawful debt, whether an enterprise exists, and whether

defendants conducted or participated in an enterprise. ***No reliance or causation need be shown*** ...." (emphasis added)).

Plaintiffs' RICO claims are particularly well-suited for class treatment because "common issues of fact in a RICO action, concerning the existence of an enterprise and a pattern of racketeering activity are quite substantial" and "would tend to predominate over all but the most complex individual issues." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357-58 (11th Cir. 2009). For example, "[t]he existence of a conspiracy, and whether the defendants aided and abetted each other" are "issues common to all of the plaintiffs" that "tend[] to predominate." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004).

Finally, this case is also similar to other cases where a defendant's lending practices or other financial misconduct predominates because the defendant's uniform treatment of the plaintiffs caused them harm. As another court explained:

> Given the standardized nature of the payday loan transactions and the uniform manner in which Defendants made, processed and collected on the loans, and that few variations exist in the claims or the factual bases underlying the claims and the legal claims and theories asserted, the court finds that the factual and legal issues in this case would be subject to generalized proof applicable to the entire class, and that such issues predominate over any issue that may be subject only to individualized proof.

*Purdie*, 2003 WL 22976611, at *4. Like the plaintiffs in *Purdie* and similar cases, Plaintiffs and the classes have been subjected to the same usurious lending and collection practices, and therefore, common issues predominate. *See also Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572, 579 (M.D. Fla. 2006) (finding that common issues predominated with respect to claims under the Truth in Lending Act, Finance Act, FDUPTA, and unjust enrichment based on defendant's "deceptive acts common to the purported class"); *Spinelli v. Capital One Bank*, 265 F.R.D. 598, 610 (M.D. Fla. 2009) (adopting report and recommendation to certify class claims alleging sale of

deceptive credit protection product); *see also Madden*, 237 F. Supp. 3d at 160–61 (finding predominance in a case based on violations of New York's usury laws).

For damages, Plaintiffs are seeking amounts paid in connection with their loans. With records from the lenders, this amount can be calculated easily on a classwide basis. Even if damages did require some evidence from individual consumers, this is not a case where the determination of damages awarded will largely depend on individualized testimony, such as in a case where the consumer is seeking emotional distress. Because the loans were credited and debited using ACH transactions to and from the consumers' bank accounts, bank records will show the relevant transactions that could be used to calculate damages. To the extent that there might be some individualized damage determinations, in no event would those issues predominate over the common liability issues. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.").

### 2. Class treatment is the superior method for litigating the classes' claims.

Finally, the Court must determine whether a class action is superior to other methods for the fair and efficient adjudication of the controversy under Fed. R. Civ. P. 23(b)(3). *Lienhart*, 255 F.3d at 142; *In re A.H. Robins Co., Inc.*, 880 F.2d 709, 713 (4th Cir. 1989). The factors to be considered in determining the superiority for the class mechanism are: (1) the interest in controlling individual prosecutions; (2) the existence of other related litigation; (3) the desirability of concentrating the litigation in the forum; and (4) manageability. *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997); *Newsome v. Up_To_Date Laundry, Inc.*, 219 F.R.D. 356, 365 (D. Md. 2004).

In examining these factors, it is proper for a court to consider the "inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *CitiFinancial v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164 (7th Cir. 1974). "Class actions are particularly appropriate" where, as here, "multiple lawsuits would not be justified because of the small amount of money sought by the individual plaintiffs." *See Advisory Committee Note* to 1996 Amendment to Rule 23.

Class litigation is not only the most efficient means of adjudicating these disputes; it is the only means. Separately litigating the common issues that bind the class, whether in hundreds or hundreds of thousands of individual lawsuits would be a practical impossibility—even assuming it were economically feasible for consumers to pursue these claims on their own. Given the amount of work involved in unraveling this complex rent-a-tribe scheme, an individual case worth a few thousand dollars simply is not a viable alternative to a class proceeding. There simply is no other practical means for this class—mostly low-income consumers—to challenge a practice that stands in uniform violation of Virginia's usury laws. "The desirability of providing recourse for the injured consumer who would otherwise be financially incapable of bringing suit and the deterrent value of class litigation clearly render the class action a viable and important mechanism in challenging fraud on the public."  6 H. Newberg and A. Conte, *Newberg on Class Actions* § 21:30 (4th ed. 2003).

Furthermore, even if just a small fraction of the class were to bring individual suits, the adjudication of common issues in a single proceeding would be infinitely more efficient than would be the separate adjudication of thousands of individual claims.[15] Additionally, there "is a

---

[15] *See, e.g.*, *White v. E-Loan, Inc.*, No. C05-02080SI, 2006 WL 2411420, at *9 (N.D. Cal. 2006)("given that thousands of consumers may have suffered identical injury, a class action is certainly the most efficient way to adjudicate disputes over those consumers' rights"); *Cavin*, 236

strong presumption in favor of a finding of superiority" where, as here, "the alternative to a class action is likely to be no action at all for the majority of class members." *Cavin*, 236 F.R.D. at 396. This presumption is rooted in the policy that lies "at the very core of the class action mechanism"— namely, "overcom[ing] the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 625; *see also Henry*, 199 F.R.D. at 573 (finding a class action was superior because "the potential class is composed of individuals so financially strapped that they would borrow money at extremely usurious rates."); *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 880 (7th Cir. 2000) (stating in "small-stakes cases, a class suit is the best, and perhaps the only, way to proceed").

Given the commonality that characterizes all of the issues in these cases, such treatment will not raise any significant manageability hurdles. Even if it did, however, "[a] class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the . . . wrongdoing that will go unpunished if class treatment is denied—to no litigation at all." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)

## CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request the Court to grant this motion for class certification.

Respectfully submitted,
**PLAINTIFFS**

By:____/s/ Kristi C. Kelly_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY & CRANDALL, PLC

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
Consumer Litigation Associates, P.C.

F.R.D. at 396; *White v. Imperial Adjustment Corp.*, E.D. La. No. CIV.A. 99-3804, 2002 WL 1809084, at *15 (E.D. La. Aug. 6, 2002), ("the piecemeal approach is rife with shortcomings, not the least of which is the possibility of inconsistent adjudications with regard to an identical course of conduct"), *aff'd in part*, 75 Fed. Appx. 972 (5th Cir. 2003).

3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com

763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th of November 2018, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_____/s/_____

Kristi Cahoon Kelly, Esq. (VSB #72791)
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Tel: 703-424-7572
Fax: 703-591-0167
Email: kkelly@ kellyandcrandall.com
*Counsel for the Plaintiffs*